HERMAN L. LOEB *et al.*, Plaintiffs-Appellants, v. WILMA GRAY *et al.*, Defendants-Appellees.

Fifth District No. 5—84—0172

Opinion filed February 27, 1985.

John F. Borden, of Gosnell, Benecki, Borden & Enloe, Ltd., of Lawrenceville, for appellants.

A. Ben Mitchell and John J. Flood, both of Musick & Mitchell, of Mt. Vernon, for appellees Wilma Gray and Leah Cornwell.

No brief filed for appellees William R. Conyers and Sohio Supply Company.

PRESIDING JUSTICE JONES delivered the opinion of the court:

The plaintiffs, Herman and Betty Loeb, appeal the dismissal with prejudice of their amended complaint in an action for reformation of a contract for the sale of real estate and for specific performance of the contract as reformed. We affirm.

In their complaint, which was verified, the plaintiffs sought specific enforcement by the defendants Wilma Gray and Leah Cornwell of an alleged contract for the sale of real estate. The complaint was in four counts, in the others of which the plaintiffs sought from certain other of the defendants an accounting for oil and gas produced from the premises, from the defendants Gray and Cornwell damages in the amount of $1,000,000, and from the defendant Sohio Supply Company the impoundment of all funds representing the proceeds of the sale of oil and gas produced from the premises. Attached to the complaint as exhibit A was the "Real Estate Listing Agreement," a form signed by the defendants Gray and Cornwell as owners and Hugh B. Miller for Curran Miller Auction and Realty, Inc., the realtor. The real estate listing agreement was entered into on October 10, 1980. Under the real estate listing agreement the owners granted to the realtor the sole and exclusive right to sell the real estate in question for a period of three months following the date of the agreement and agreed, among other things, to pay the realtor a commission of 6% of the sale price. After the printed words "Mineral Rights" on the real estate listing agreement, the following appears in handwriting: "The sellers shall reserve 1/4 of the mineral rights to each seller for their [sic] natural lifetime."

Attached to the complaint as exhibit B is the "Real Estate Pur-

chase Agreement," also a form, signed by Herman Loeb as "Purchaser." Paragraph 12 of the real estate purchase agreement states as follows:

> "Acceptance: This offer shall remain open for acceptance by the Owners, by their signatures affixed hereto, at or prior to 12:00 o'clock, noon, on the 25 day of October 1980. If accepted within such time, this agreement shall be in full force and effect."

The real estate purchase agreement was executed by the "Purchasers" on October 11, 1980.

Paragraph 14 of the real estate purchase agreement provides "FURTHER CONDITIONS" as follows:

> "Sellers, Wilma Gray and Leah Cornwell, each respectively reserves for herself, for and during the period of her natural life, an undivided 1/4 interest in and to the oil, gas and other minerals, in, under and that may be produced from the above lands, subject to any rights now or hereafter existing in and to any lessee or assignee under any valid and subsisting oil and gas lease heretofore or hereafter executed. *Purchaser shall have full power and authority to lease all of said lands for oil, gas and other minerals, and Sellers' signatures shall not be required to effect said leases.* 1980 taxes due and payable in 1981 shall be deducted from the purchase price to be paid by Sellers for said premises, the deduction to be estimated on the basis of 1979 taxes paid in 1980." (Emphasis added.)

The realtor's signature appears beneath the following words on the real estate purchase agreement:

> "RECEIPT BY REALTOR:
> I, hereby, acknowledge receipt of deposit of $25,000.00 in XXXX - Check."

At the bottom of the real estate purchase agreement appear these typewritten words: "SUBJECT TO THE TERMS, CONDITIONS AND MODIFICATIONS SET FORTH IN THE ADDENDUM ATTACHED HERETO." Beneath these typewritten words are the printed words, with the date supplied in handwriting: "ACCEPTED by Owners, this 21st day of October 1980." Beneath appear the signatures of Leah Cornwell and Wilma Gray, each as "Owner."

Attached to the complaint as exhibit B—1 is the "ADDENDUM TO REAL ESTATE PURCHASE AGREEMENT." The addendum states, "This Addendum to that certain Real Estate Purchase Agreement dated October 11, 1980, executed by Herman L. Loeb shall constitute the acceptance by the undersigned of the terms and conditions

of said Real Estate Purchase Agreement subject to the following terms, conditions and modifications," paragraph four of which provides:

"Paragraph 14 shall be modified and clarified as follows:

Sellers Wilma Gray and Leah Cornwell each respectively reserves for herself, for and during the period of her natural life an undivided one-quarter (¼) interest each in and to the oil, gas and other minerals in, under and that may be produced from the subject property. *Sellers shall each respectively be entitled to, for and during the period of her natural life, one-quarter (¼) of all proceeds received by lessor of the subject property pursuant to existing and future oil and gas leases. In the event that Purchaser produces oil or gas directly rather than under lease, Sellers shall each respectively, for and during the period of her natural life, receive one-quarter (¼) of the gross proceeds derived therefrom.* All payments shall be made quarterly and Purchaser shall furnish with each of said payments an accounting for the manner in which the amount of said payment is determined. *Purchaser shall have full power and authority to lease all of said lands for oil, gas and other minerals and Sellers' signatures shall not be required to effect said leases.* 1980 taxes due any payable in 1981 shall be deducted from the purchase price to be paid by Sellers for said premises, the deduction to be estimated on the basis of the 1979 taxes paid in 1980. In the event that the amount deducted is insufficient to pay the entire taxes due for 1980, Sellers shall pay to Purchaser the balance upon demand. In the event that the amount deducted exceeds the actual taxes due for 1980, Purchaser shall refund to Sellers the amount of the overpayment at the time of payment of the 1980 tax bill." (Emphasis added.)

This sentence follows immediately: "That certain Real Estate Purchase Agreement dated October 11, 1980 is accepted by the undersigned on the terms, conditions, modifications, and clarifications set forth hereinabove." The addendum is signed by Wilma Gray and Leah Cornwell beneath the words, "EXECUTED by owners this 21st day of October, 1980, at El Cajon, California."

In their complaint the plaintiffs alleged, *inter alia*, "the acceptance by plaintiffs of [defendants'] offer to sell said premises upon the terms set out in said Real Estate Listing Agreement" and that the "Addendum constituted an attempt on the part of defendants, WILMA GRAY and LEAH CORNWELL, to change the terms of

their offer and plaintiffs' acceptance thereof by increasing the reservation of mineral rights beyond the ¼th each for their lifetimes proposed by them and accepted by plaintiffs." Upon the motion of the defendants to dismiss the complaint, the trial court found "[t]hat the documents attached to the complaint do not indicate that the parties at any time entered into a written binding contract for the sale of the real estate described in the complaint" and ordered the complaint dismissed with prejudice.

Thereafter, on August 6, 1982, the plaintiffs filed a motion to vacate the order dismissing the complaint with prejudice or, in the alternative, for leave to file an amended complaint. The trial court granted the motion to vacate and granted the plaintiffs leave to file an amended complaint. An amended complaint, likewise verified, appears in the record together with the plaintiffs' motion to vacate or for leave to file an amended complaint. However, it bears no file mark. An amended complaint, also verified, but differing from the other amended complaint in the record, was filed on December 27, 1982.

In the amended complaint of December 27, 1982, the plaintiffs alleged that they

"made an oral offer to defendants through Hugh B. Miller, of Curran Miller Auction & Realty Company, sellers' agent, to purchase [the real property in question] on the following terms: Plaintiffs to acquire said real estate by warranty deed for the sum of $110,000.00; defendants, Wilma Gray and Leah Cornwell, each to reserve an undivided one-fourth of the oil, gas, and other minerals in and under said land for their respective natural lives; the conveyance to be subject to any lease of record covering and affecting said lands; and plaintiffs to have the right to lease said lands for oil and gas purposes without defendants' signatures."

The plaintiffs alleged further that "[u]pon being notified of plaintiffs' offer defendants, Wilma Gray and Leah Cornwell, both orally accepted same," subject to modifications concerning tenants' rights and 1980 taxes. The plaintiffs alleged that on or about October 10, 1980, they approved these modifications and "orally advised such defendants through Hugh B. Miller, their agent, of such approval and acceptance." Thereafter, according to the plaintiffs' allegations, Miller, as the agent of the defendants, prepared the real estate listing agreement, which "specifically authorized Curran Miller Auction & Realty to sell the described real estate on the terms plaintiffs and defendants had previously agreed upon." On or about the same date, according to the plaintiffs' allegations, Miller, as the agent of the defendants, pre-

pared the real estate purchase agreement, which,

> "(except as noted hereafter), stated the terms of the sale and purchase previously agreed [*sic*] between plaintiffs and defendants, Wilma Gray and Leah Cornwell. It specifically authorized Curran Miller Auction & Realty to enter into a written contract for such sale on behalf of sellers. Plaintiff Herman L. Loeb, on behalf of purchasers, executed said agreement and paid $25,000.00 to Hugh B. Miller, as agent for sellers, who thereupon executed said contract."

The plaintiffs alleged that the language in paragraph 12 of the real estate purchase agreement and the language concerning the receipt by the realtor, which we have already described,

> "was included in the standardized preprinted real estate purchase agreement form, and because of a mutual oversight and mutual mistake of the parties and the mistake of the scrivener was not stricken or amended, although the parties had already agreed that the sellers would sell and the purchasers would purchase the real estate on the terms detailed in paragraphs 3, 4 and 5 above [of this amended complaint], and said Hugh B. Miller's signature constituted the acceptance by the sellers.
>
> It was the intent of the parties that paragraph 12 and the acceptance language (the last sentence with signature lines) be stricken and that the receipt paragraph be worded as follows:
>
>> 'Receipt and acceptance by owners' agent: I, hereby, acknowledge receipt of deposit of $25,000.00 check and accept this contract.' "

The plaintiffs alleged that the real estate listing agreement and the real estate purchase agreement as prepared by Miller were forwarded "on or about October 10, 1980" by Miller to defendants Gray and Cornwell, who signed the real estate listing agreement and returned it to Miller. The plaintiffs sought reformation of the real estate purchase agreement "by deleting paragraph 12 and the last sentence with lines for signature [by the owners], and correcting the receipt language as indicated above, to reform and correct said contract to the actual agreement made by the parties." In addition, the plaintiffs sought specific performance by the defendants Gray and Cornwell of the contract as reformed.

In the other three counts of the amended complaints, the plaintiffs sought, as they had in their complaint, an accounting, damages, and impoundment of funds. Attached to the amended complaint as exhibit A is the real estate listing agreement and, as exhibit B, the real estate purchase agreement. The copy of the real estate purchase

agreement serving as exhibit B to the amended complaint, however, does not bear the owners' signatures or in any way refer to the addendum. It does contain the "FURTHER CONDITIONS" of paragraph 14, which we have set forth above.

The defendants, Gray and Cornwell, moved to dismiss the amended complaint asserting, *inter alia,*

"[t]hat Plaintiffs have failed to plead a proper cause of action for reformation of a contract for the reason that there can be no reformation where there has not already been a meeting of the minds and further, this Court has already ruled that there was no meeting of the minds between the parties and that at no time did the parties enter into a binding contract for the sale of the subject property."

In its order the trial court found that the amended complaint should be dismissed with prejudice,

"that the amended Complaint as filed, together with the prior verified Complaint, and all the documents as attached to the verified Complaints, conclusively establish that no agreement was entered into between the parties which resulted in a document evidencing the agreement being duly signed by the Defendants, Wilma Gray and Leah Cornwell, or an agent duly authorized on their behalf, and accordingly, the alleged contract is therefore unenforceable and the action barred by the Statute of Frauds, Ill. Rev. Stat., Ch. 159, sec. 2."

From this order dismissing the amended complaint with prejudice the defendants appeal.

It is elementary that in order to constitute a contract between two parties there must be mutual assent by the contracting parties on the essential terms and conditions of the subject about which they are contracting. (*Bank of Marion v. Robert "Chick" Fritz, Inc.* (1973), 9 Ill. App. 3d 102, 291 N.E.2d 836, *aff'd* (1974), 57 Ill. 2d 120, 311 N.E.2d 138.) For a contract to exist there must be an offer and acceptance, and to create a binding contract the acceptance must comply strictly with the terms of the offer. (*Zeller v. First National Bank & Trust Co.* (1979), 79 Ill. App. 3d 170, 398 N.E.2d 148.) An acceptance requesting modification or containing terms that vary from those offered constitutes a rejection of the original offer and becomes a counterproposal that must be accepted by the original offeror before a valid contract is formed. (*Zeller v. First National Bank & Trust Co.* (1979), 79 Ill. App. 3d 170, 398 N.E.2d 148.) Similarly, when one accepts an offer conditionally or introduces a new term into the acceptance, no acceptance occurs; rather, there is a counterproposal

requiring acceptance by the offeror before a valid contract is formed. *Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 400 N.E.2d 614.

■ In the case at bar the plaintiffs state in their amended complaint filed on December 27, 1982, that the real estate listing agreement specifically authorized the realtor to sell the real estate in question "on the terms plaintiffs and defendants had previously agreed upon." As we have already indicated, certain terms are set forth in the real estate listing agreement, among them the reservation by the sellers of "1/4 of the mineral rights to each seller for their [sic] natural lifetime." The real estate purchase agreement, which, according to the plaintiffs in the amended complaint "stated the terms of the sale and purchase previously agreed [sic] between plaintiffs and defendants," provided, however, that the "[p]urchaser shall have full power and authority to lease all of said lands for oil, gas and other minerals, and Sellers' signatures shall not be required to effect said leases." Of the rights of an owner of a mineral estate, the defendants maintain in their brief, as they did in the trial court, that the owner of a mineral interest has the right not only to drill for and to produce oil and gas but also to execute leases to a third person as well as to receive bonuses, delay rentals, and royalties under any such oil and gas lease. As stated in 1 Williams & Meyers, Oil & Gas Law sec. 301, at 433 (1983), the owner of the mineral estate

> "has the right to execute oil and gas leases to operators to secure the exploration and development of the minerals. Leasing is the typical arrangement between landowner and operator for the exploitation of the mineral estate. The right to lease is called here the *executive right* or the *leasing right.*"

In discussing the creation and characteristics of the executive right the authors define that right as "the exclusive power to execute oil and gas leases." (2 Williams & Meyers, Oil & Gas Law sec. 338, at 193 (1983).) Thus, the terms concerning "Mineral Rights" as expressed in the real estate listing agreement differ from those in paragraph 14 under "FURTHER CONDITIONS" as expressed in the real estate purchase agreement. Under the terms of the real estate listing agreement, the defendants, as sellers, would have the exclusive power to execute oil and gas leases with respect to the property in question, whereas under the terms of the real estate purchase agreement, the plaintiffs as buyers would have full power and authority to do so. As between the real estate listing agreement and the real estate purchase agreement, there is no indication of mutual assent on the part of the plaintiffs and the defendants concerning the power to execute

oil and gas leases with regard to the property in question.

■ As we have stated, the plaintiffs do not refer in their amended complaint of December 27, 1982, to the addendum to the real estate purchase agreement. In paragraph four of the addendum, the defendants provide with regard to the power to lease in the same way as was done in the real estate purchase agreement, that is, that the "Purchaser shall have full power and authority to lease all of said lands for oil, gas and other minerals and Sellers' signatures shall not be required to effect said leases." Although, in effect, the matter of the power to lease is resolved in the addendum in favor of the plaintiffs, elsewhere in that same paragraph in the addendum the defendants specify that

> "Sellers shall each respectively be entitled to, for and during the period of her natural life, one-quarter (¼) of all proceeds received by lessor of the subject property pursuant to existing and future oil and gas leases. In the event that Purchaser produces oil or gas directly rather than under lease, Sellers shall each respectively, for and during the period of her natural life, receive one-quarter (¼) of the gross proceeds derived therefrom."

Although the parties do not address the matter, we consider significant certain general rules concerning principal and income as applied to an oil and gas lease. As stated in 3A W. Summers, The Law of Oil & Gas sec. 613, at 502-04 (1958),

> "Where the life tenant and remainderman or reversioner join in a lease for oil and gas purposes, or where such a lease is executed by a trustee having power to do so, it is [sic] well settled rule that the cash bonus, delay rentals, oil and gas royalties and gas well rentals are corpus of the estate and that the life tenant is entitled only to the interest thereon for the period of his life. This rule does not apply, however, if the life tenant and remainderman have agreed upon a different division of the returns from the lease, or such a lease is made by a trustee under an express power and the settlor has indicated a different division."

In the instant case, the defendants as life tenants sought not merely the interest upon the proceeds of the lease but the proceeds themselves. Such an apportionment departs from that provided for under the generally prevailing rule. (See also sections 10 and 11 of the Principal and Income Act, which relate to trusts (Ill. Rev. Stat. 1983, ch. 30, pars. 510, 511); *Central Standard Life Insurance Co. v. Gardner* (1959), 17 Ill. 2d 220, 161 N.E.2d 278 (royalties and bonuses paid un-

der oil and gas leases of the trust property were the considerations for sale of a portion of the real property belonging to the trust, represented a return of capital, and should have been credited to the trust).) As between the real estate purchase agreement and the addendum thereto, there is, then, no indication of mutual assent between the plaintiffs and the defendants concerning the disposition of the proceeds from production of oil and gas either pursuant to or in the absence of a lease.

■ The plaintiffs state correctly that a motion to dismiss admits all facts well pleaded and a cause of action should not be dismissed upon its pleadings unless it plainly appears that no set of facts can be proved under the pleadings that will entitle the plaintiffs to recover. (*Pennington v. Jones* (1977), 46 Ill. App. 3d 65, 360 N.E.2d 566.) The provisions contained in the real estate listing agreement and the real estate purchase agreement with regard to the power to execute a lease reveal that no meeting of the minds of the parties occurred concerning this essential term of the alleged contract. Hence, these two documents show that no contract was formed at that time. Although the plaintiffs do not invite us to examine the addendum to the real estate purchase agreement, if it is considered, it suggests, as we have said, that the difficulty concerning the power to lease was resolved in favor of the plaintiffs but that a new term was introduced, namely, the disposition of the proceeds of oil and gas production. That term was never accepted; hence, no contract was formed.

We conclude that the plaintiffs could not possibly prove any set of facts under the pleadings that would entitle them to recover. Therefore, the trial court was correct in dismissing the amended complaint with prejudice.

The plaintiffs contend that the trial court erred in considering the prior verified complaint and documents attached thereto. However, we see no error in the court's having done so in view of the rule that where the original pleading is verified, as opposed to being unverified, it remains a part of the record upon the filing of an amended pleading (*Yarc v. American Hospital Supply Corp.* (1974), 17 Ill. App. 3d 667, 307 N.E.2d 749.) Furthermore, the result would have been no different had the trial court not considered the earlier pleading.

■ We are cognizant that plaintiffs seek in their amended complaint reformation of the contract alleged. However, there can be no reformation where there has not already been a meeting of the minds (*Harden v. Desideri* (1974), 20 Ill. App. 3d 590, 315 N.E.2d 235). Since no meeting of the minds occurred here, there is nothing to reform.

In their reply brief plaintiffs invite us to find that the defendants

are bound by a concession in their brief that the amended complaint, considered in and of itself, states no cause of action. We decline the invitation, however, because, first, the concession alleged was not clearly made and, second, the issue relates to a matter of law; defendants will not be held to have conceded a point of law that, as conceded, is erroneous.

Affirmed.

KASSERMAN and KARNS, JJ., concur.