CHARLES BLAKEMORE, Plaintiff-Appellee and Cross-Appellant, v. LAKE HOLIDAY PROPERTY OWNERS' ASSOCIATION, Defendant-Appellant and Cross-Appellee.

Second District   No. 2—85—0076

Opinion filed June 4, 1986.

Melvin Hoffman, of Hoffman, Mueller & Creedon, of Ottawa, for appellant.

Hartman E. Stime, of Peregrine, Stime, Newman & Ritzman, Ltd., of Wheaton, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, Charles Blakemore, brought this action against defendant, Lake Holiday Property Owners' Association, in the circuit court of Kane County. Counts I and II of plaintiff's three-count amended complaint charged defendant with interfering with plaintiff's possession and use of certain leased premises—namely, a restaurant. Plaintiff prayed for injunctive relief and for such other relief as the court should deem equitable and proper. Count III sought an injunction ordering the removal of certain gates and posts that defendant had constructed which, plaintiff alleged, denied him access to two parcels of land that he owned.

Following a bench trial, the court found under counts I and II that defendant had interfered with plaintiff's leasehold interest; that

plaintiff's actions constituted a partial abandonment of his rights; that the circumstances did not warrant injunctive relief of any nature; and that plaintiff was entitled to recover $25,000 in actual damages and $5,000 in attorney fees. With respect to count III, the court found in defendant's favor. Defendant appeals from the award of money damages and attorney fees, while plaintiff cross-appeals from the denial of injunctive relief under count III. We note at this point that plaintiff readily admits that it was improper for the court to grant attorney fees and that the portion of the judgment order so providing must be reversed.

As to counts I and II of plaintiff's amended complaint, the evidence established that on June 16, 1966, plaintiff entered into a contract for sale with Illinois Wildlife Clubs, Inc., a land developer, for the purchase of two lots—denominated lots 1287(a) and 1329(a)—in the Lake Holiday Development in La Salle County. In addition to providing for the sale of the two lots, the contract granted plaintiff the exclusive right to sell, at retail, food and beverages in the Lake Holiday Development. The agreement also gave plaintiff a 99-year lease in a portion of the building known as the Lodge. Specifically, plaintiff was given the right to operate a restaurant or similar establishment in "that certain portion of the building known as the 'lodge' *** the same being presently utilized by [the developer] as a sales office and the approximate size of said area being 500 square feet."

Shortly after the contract was executed, plaintiff established a food concession business, which he operated out of a "chuckwagon." By 1968 the developer had sold most of the remaining lots, and control of the development was turned over to defendant, with defendant becoming the assignee of the contract between plaintiff and the developer. Plaintiff then moved his operation, known as Lake Holiday Concessions, into the former sales office. Sometime in 1968 plaintiff requested and received permission to build a porch along one of the exterior walls of his restaurant. Plaintiff's porch was built at the back of the Lodge, and one end butted against another porch which defendant had constructed some years earlier. Together the two porches formed an L-shape configuration. Plaintiff also installed two serving windows directly above his porch. Plaintiff's operation at this point was strictly a carry-out business, the vast majority of which was conducted through the two serving windows.

In addition to building the porch and installing the serving windows, plaintiff obtained permission to place various vending machines in the hallway situated between the restaurant and the portion of the Lodge utilized by defendant. In 1975 the parties agreed that it would

be mutually beneficial to allow plaintiff to expand his facilities into the hallway area. Plaintiff, it seems, wanted the additional space in order to provide customers with an inside eating area. Defendant, on the other hand, was interested in having the hallway closed off in order to prevent children from running through the building, a problem which had become of increasing concern. Plaintiff testified he was given permission to use the hallway as part of his restaurant. There was no lease signed for the hallway area; plaintiff did not pay anything extra for the additional space, and there was no agreement between the parties as to how long plaintiff would be able to use the hallway.

As part of his remodeling, plaintiff made what appears to be rather extensive renovations to the hallway, and there is no question but that it became an integral part of his business. As originally constructed, the hallway had exterior doors at each end. The rear door was located on the same exterior wall as plaintiff's two serving windows and opened onto the porch that defendant had constructed. Plaintiff removed the rear door and installed a third serving window in its place. According to various exhibits contained in the record, the third window was situated within a few feet of the other serving windows.

In 1976 plaintiff began subleasing the restaurant operation to various individuals on an annual basis at rentals ranging from $225 to $250 per month. Because defendant was interested in obtaining a kitchen facility for use by its members at not-for-profit functions and social gatherings, and in light of a number of disagreements with plaintiff over the right of association organizations to dispense food at such functions, a contract was entered into in April 1978 under which defendant agreed to purchase the remaining term of plaintiff's lease. Plaintiff's current tenant agreed to an early termination of his lease, whereupon plaintiff sold his restaurant equipment and delivered possession of the premises to defendant. Not long thereafter, a member of the association who was dissatisfied with the contract filed suit in the circuit court of La Salle County seeking to have the agreement declared null and void. Some two years later, on July 29, 1980, the court ruled that the contract was void for the reason that its execution had been *ultra vires*. As a result plaintiff regained possession of the leased premises, and he informed defendant by letter of his intent to resume operation of a restaurant, saying he was in the process of reacquiring the necessary equipment. Plaintiff, however, made no attempt to obtain the needed equipment but instead hired Charles Bebber, a real estate broker, for the purpose of securing a tenant or pur-

chaser for the restaurant business. Bebber's efforts have thus far proved unsuccessful, and it is not disputed that the premises have remained vacant since plaintiff regained possession in 1980.

Sometime in either November or December of 1980, unbeknownst to plaintiff, defendant tore down its porch as well as the porch underneath plaintiff's serving windows. According to a number of witnesses, the porches had become dilapidated and unsafe, a condition which had resulted in numerous complaints from members of the association. Although plaintiff admitted that defendant's porch was rotted and unsafe, he denied that his porch was in need of repair.

In January 1981 defendant began construction of an addition, the purpose of which was to provide space for a kitchen. It was not defendant's intent to compete with plaintiff by selling food and beverages at retail but merely to furnish association members with a kitchen facility which could be used for parties and various other association gatherings. Defendant built the addition over what had previously been its porch. In other words, defendant replaced its porch with the kitchen addition. This required defendant to remove one of plaintiffs serving windows, specifically the third window that was located in what had formerly been the hallway area. The addition did not encroach upon the interior of plaintiff's restaurant; rather, it merely extended out from the former hallway. Thus, plaintiff's two other serving windows were unaffected by the construction. Moreover, the evidence established that there was nothing to prevent the construction of a new porch under plaintiff's two existing serving windows.

Plaintiff filed this action in chancery for injunctive relief, alleging that by removing his porch and serving window, defendant wrongfully interfered with his interest in the demised premises. Plaintiff did not specifically pray for money damages, but his amended complaint contained a general prayer for "such other and further or different relief in the premises as the court may determine equitable and proper." Plaintiff's theory at trial was that defendant's actions completely destroyed the value of his leasehold, thereby making it impossible to operate a restaurant business or to sell or sublease his interest. Plaintiff introduced evidence concerning the extent of his monetary damages, and during closing argument he calculated his total damages at $11,750. Plaintiff made clear, though, that this figure was based upon his assumption that the court would order defendant to remove the addition. The trial court found that defendant had in fact interfered with plaintiff's leasehold interest. However, the court denied plaintiff's request for injunctive relief and instead awarded actual damages

in the sum of $25,000.

Defendant raises a number of arguments for overturning the damage award, only one of which need be addressed here. Defendant contends there was no basis for the assessment of damages since the evidence showed that it had not interfered with any portion of plaintiff's leasehold. It maintains that neither the hallway nor the outside porches were part of the demised premises. Plaintiff, on the other hand, insists that the lease for the former sales office included both the hallway and porches.

■ Resolution of this issue requires us to construe the lease agreement which was part of the contract for sale executed in 1966. The interpretation of a lease is a question of law. (*Hartwig Transit, Inc. v. Menolascino* (1983), 113 Ill. App. 3d 165, 168; 24 Ill. L. & Prac. *Landlord and Tenant* sec. 41 (1980).) The primary objective in construing a lease is to ascertain the intent of the parties. (*Deerpath Investment, Inc. v. Barack* (1983), 112 Ill. App. 3d 692, 694; *Cory v. Minton* (1977), 49 Ill. App. 3d 312, 315-16.) We think it important to emphasize at the outset that plaintiff did not allege in his pleadings that there had been a modification of the lease. Consequently, we must construe the agreement as it existed at the time of its execution.

The lease is admittedly ambiguous concerning the extent of the demised premises. It gave plaintiff the right to operate a restaurant in the sales office area of the Lodge, which was described as consisting of approximately 500 square feet. In fact the sales office comprised 380 square feet. Only if the hallway space were added would the total area approximate 500 square feet. Plaintiff argues that the lease must be construed to include the hallway. He points out that he used the hallway as a location for various vending machines from the time he moved his operation into the sales office. Further, he notes that in 1975 the parties agreed that it would be mutually beneficial if he were permitted to expand his operation and incorporate the hallway into his restaurant. Given these facts, plaintiff submits the trial court properly found the hallway to be part and parcel of the demised premises.

We find plaintiff's argument unpersuasive. Where a lease is ambiguous, the court may, in determining what the parties intended, consider various extrinsic aids, including the conduct of the parties after the lessee takes possession of the premises. (See *Cory v. Minton* (1977), 49 Ill. App. 3d 312, 316-17.) "The courts will give great weight to a construction of a lease placed on it by the parties themselves and by their acts or failure to act in connection with it." (24 Ill. L. &

Prac. *Landlord and Tenant* sec. 46 (1980).) Here plaintiff testified that prior to placing his vending machines in the hallway, he obtained permission from defendant. He further stated that while he could not remember precisely, on one occasion in 1975 defendant may have turned down his request to put pop machines in the hallway. The mere fact that plaintiff felt it necessary to request authorization before installing vending machines in the hallway area indicates, in our opinion, that plaintiff did not consider the hallway to be part of the demised premises. Also, plaintiff testified he was given permission to expand his operation into the hallway. While the lease expressly required written approval for any remodeling over $500, plaintiff stated that he did not feel he could just enclose the hallway without first getting permission from defendant. Most significant is plaintiff's testimony after being called as an adverse witness. At one point the following colloquy occurred:

"Q. [Defendant's attorney] When, if ever, was any type of lease or contract signed for the lease of what was formerly called the hall area?

A. [Plaintiff] I was given permission to occupy it, but no lease was drawn up.

Q. No lease was ever signed, right?

A. No.

Q. You were given permission to occupy it?

A. That's right.

Q. For how long?

A. Forever.

Q. Forever? That's your understanding?

A. They didn't tell me how long, they didn't say that I could have it for a month.

Q. Or a year or five years or ten years, correct?

A. Well, they allowed me to enjoin it in with the restaurant, so I assumed that it would become a part of the restaurant.

Q. You assumed?

A. I did."

Plaintiff then admitted the hallway was not part of the original lease.

■ Given plaintiff's testimony we are forced to conclude that the hallway is not part of the demised premises. Indeed, to hold otherwise would require us to completely disregard plaintiff's testimony as to what he considered to be included in the lease. Our decision, of course, must be based upon the evidence presented at trial. Therefore, since the serving window that defendant removed during the course of constructing the kitchen addition was located in the hallway

area, we hold that defendant's action did not constitute an interference with plaintiff's leasehold interest.

■■■ We reach the same conclusion with respect to the porches. When plaintiff took possession of the sales office, the only porch existing was the one that defendant had constructed along one of the walls of the Lodge. Plaintiff repeatedly stated that the porch belonged to defendant and was not part of the lease. After plaintiff moved his operation into the sales offices, he constructed his own porch along one of the walls of his restaurant, thereby enabling him to serve customers through the two serving windows he later installed. Plaintiff's position in this court is that both porches are part of the lease. This, however, is clearly contrary to plaintiff's testimony at trial. When asked to identify what porches he considered to be part of the lease, plaintiff replied, "None." He indicated that the lease covered only the inside portion of the building. Consequently, as with the serving window mentioned above, we must conclude that defendant's removal of the porches did not constitute an interference with plaintiff's leasehold. We simply cannot ignore plaintiff's testimony and construe the lease to include items which defendant, by his own admission, testified were not included.

Accordingly, given the particular facts of this case, we hold that the trial court erred in finding that the defendant interfered with plaintiff's interest under the lease. As such, the portion of the judgment order assessing damages against defendant in the amount of $25,000 is reversed.

■ We next turn to plaintiff's claim that the trial court erred by refusing to grant injunctive relief under count III of his amended complaint. Count III concerns lots 1287(a) and 1329(a) that plaintiff purchased in 1966. Both lots are unimproved and located adjacent to beach areas in the Lake Holiday Development. According to the contract for sale, the lots were intended to be used for the sale of food, beverages and various sundry beach items, and plaintiff expressly agreed to begin operating a business on at least one of the lots no later than 30 days after signing the contract. Plaintiff was guaranteed continued access to the lots "for the purposes of the operation of such businesses, the minimum width of said access to be twenty (20) feet." The record indicates that with the possible exception of one brief period, plaintiff has not operated a business on either lot, and he testified he has no plans to do so.

Defendant encountered problems with individuals, not residents of the Lake Holiday Development, driving their automobiles onto plaintiffs lots and holding late night drinking parties. To alleviate the prob-

lem defendant erected posts and gates across the lots. They were not located on plaintiff's property but rather on property owned by the association. The gates were apparently secured with padlocks and prevented automobiles from being driven onto the two parcels of land. They did not, however, prevent a person from walking onto the lots. Claiming that the posts and gates deny him access to his property, plaintiff argues the trial court erred in not issuing an injunction for their removal.

Whether to grant or deny injunctive relief is a matter which rests within the sound discretion of the trial court. (*Houseknecht v. Zagel* (1983), 112 Ill. App. 3d 284, 292; *Board of Education v. Eckmann* (1982), 103 Ill. App. 3d 1127, 1130.) Here plaintiff testified that he did not want people driving onto his property; that he never demanded that the gates or posts be removed, even though they had been in existence for three or four years; and that defendant had never denied him access to the lots with respect to the purpose for which they were intended to be used. Moreover, it is not at all clear from plaintiff's testimony whether he actually wanted the gates and posts removed. Indeed, to say that he was equivocal on the question would be an understatement. Recognizing the obvious weakness in his client's testimony, plaintiff's counsel told the court in his closing remarks: "I'll stand here, willing to bind my client in the statement that he, despite what my client said, on the stand, *** does not want those gates there and he does not want those posts there and he wants them removed."

After carefully considering all the evidence, we are unable to say, on this record, that the trial court abused its discretion in denying plaintiff's request for injunctive relief. We note in passing that the issue may very well be moot since defendant's attorney states in his reply brief that it is his understanding that defendant has agreed to remove the gates in order to prevent any further disputes between the parties.

For the reasons stated, the portion of the trial court's judgment order awarding plaintiff $25,000 in damages and $5,000 attorney fees under counts I and II is reversed, and the portion denying injunctive relief under count III is affirmed.

Reversed in part; affirmed in part.

NASH, P.J., and HOPF, J., concur.